IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re:<br><br>James A. Kroger,<br><br>                                  Debtor. | Chapter 7<br><br>Case No. 22-30922 |
| NATHAN DORNBROOK, BARON OF ALYTH, INC. AND LONE STAR MUNICIPAL FINANCE COMPANY LLC,<br><br>                                  Plaintiffs,<br><br>v.<br><br>JAMES A. KROGER,<br><br>                                  Defendant. | Adv. Proc. No. 22-_____ |

**ADVERSARY COMPLAINT AND OBJECTION TO DISCHARGE OF DEBTS**

NOW COMES Nathan Dornbrook, Baron of Alyth, Inc. and Lone Star Municipal Finance Company LLC (collectively referred to herein as "Plaintiffs") pursuant to Federal Rule of Bankruptcy Procedure 7001 and 11 U.S.C. § 523(a)(2)(A) and §523(a)(4) and for their adversary complaint against and objection to the discharge of debts owed by James A. Kroger ("Kroger", "Defendant" or "Debtor") state as follows:

**PARTIES**

1. Dornbrook is an individual who is a U.S. citizen and who currently resides in Edinburgh, Scotland ("Dornbrook").

2. Baron of Alyth is an Ohio corporation ("Baron of Alyth") that is wholly owned by Dornbrook.

3. Lone Star Municipal Finance Company LLC is a Wyoming limited liability ("Lone Star").

4. Kroger is an individual and the Debtor in this bankruptcy.

## JURISDICTION AND VENUE

5. This adversary proceeding is commenced pursuant to Federal Rule of Bankruptcy Procedure 7001(6) and 11 U.S.C. § 523.

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. § 523. This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (J) and (I).

7. Venue in the District of Minnesota is proper under 28 U.S.C. § 1409(a).

8. The Plaintiffs consent, pursuant to Federal Rule of Bankruptcy Procedure 7008, to the entry of a final judgment or other final orders by this Court in connection with this adversary proceeding, to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## FACTUAL ALLEGATIONS

**A.  Kroger and Dornbrook's Attorney-Client Relationship.**

7. In or around February 2019, Kroger entered into an attorney-client relationship with Dornbrook to assist Dornbrook with several tax-related matters.

8. While Kroger was acting as Dornbrook's attorney, Kroger proposed to Dornbrook that they enter into a business venture together.

9. Kroger proposed that he and Dornbrook create a company to buy tax deeds for real properties in Texas at public auctions. The company would acquire the tax deeds and make a profit by fixing up and selling the properties or by renting them to tenants.

10. Kroger provided Dornbrook with a business plan and a pitch deck presentation outlining Kroger's proposed business opportunity and representing that Dornbrook's investment would be a low-risk investment that would yield returns as high as 300%.

11. As Dornbrook's attorney, Kroger had a fiduciary duty to Dornbrook, which Kroger breached by encouraging, allowing, inducing or recommending Dornbrook to enter into a business venture with Kroger that was extraordinarily risky and did not contain any proper safeguards for Dornbrook's interests and investments in the Articles of Organization and Operating Agreement of Lone Star.

12. Kroger did not send Dornbrook a disengagement letter terminating the attorney-client relationship prior to entering into a business venture with Dornbrook.

13. Kroger continued to provide services as Dornbrook's attorney after Dornbrook agreed to enter into a business venture with Kroger.

14. Kroger did not provide Dornbrook with any written notice of the desirability of seeking outside legal advice related to whether he should enter into a business venture with Kroger, nor did Kroger encourage Dornbrook in any way to seek outside legal advice as to whether Dornbrook should enter into a business venture with Kroger or the terms of that venture and relationship.

15. Kroger never obtained informed consent in writing from Dornbrook regarding Kroger continuing to act as Dornbrook's lawyer with regards to the business venture, as set forth more fully below.

16. In doing so, Kroger violated multiple rules of professional conduct with respect to his attorney-client relationship with Dornbrook, including but not limited to Rule of Professional Conduct 1.8(a), in that Kroger entered into a business transaction with his client and knowingly acquired an ownership, possessory security or other pecuniary interest adverse to Dornbrook and where (1) the transaction and terms of Kroger's acquired interest were not fair and reasonable; (2) Dornbrook was not advised in writing or given the opportunity to seek independent legal advice; and (3) Dornbrook did not give informed written consent to Kroger with regards to Kroger's concurrent roles within Lone Star and as Dornbrook's attorney.

17. Kroger violated Rule of Professional Conduct 1.9(c) in that Kroger used and benefitted from using Dornbrook's information that he acquired during his representation of Dornbrook with Dornbrook's other tax matters, including but not limited to, Dornbrook's financial situation, tax status, and level of disposable income, to concoct a business venture in which Dornbrook could be induced into supplying funds for Lone Star.

18. Finally, Kroger violated Rule of Professional Conduct 8.4(c) by engaging in a fraudulent scheme to convince Dornbrook of the existence of a great business opportunity when the purpose of inducing Dornbrook to invest in Lone Star was to benefit Kroger.

19. In reasonable reliance on the representations of his attorney Kroger, Dornbrook agreed to invest in a company to be established by Kroger.

**B.     Incorporation of Lone Star Municipal Finance Company LLC.**

20. In October 2019, Kroger incorporated Lone Star as a manager-managed Wyoming close limited liability company and drafted Lone Star's operating agreement.

21. Before he established Lone Star, and acting as Dornbrook's attorney, Kroger incorporated Baron of Alyth in October 2019 as a single-purpose entity for Dornbrook to invest in Lone Star.

22. Kroger established Intelligent Technology, Inc. as a Wyoming close corporation as a single-purpose entity to hold Kroger's interest in Lone Star ("Intelligent Technology").

23. Under Lone Star's Operating Agreement, Baron of Alyth and Intelligent Technology are Lone Star's only members, with Baron of Alyth holding 51% of the ownership interest of Lone Star and Intelligent Technology holding the other 49%.

24. Kroger drafted Lone Star's Operating Agreement to make Intelligent Technology, his wholly owned company, the "Chief Executive Manager" of Lone Star. At all relevant times after the formation of Lone Star, Kroger was and is the sole owner of Intelligent Technology, which has and had no other business or functional purpose than allowing Kroger to own an interest in and control Lone Star.

25. Under Lone Star's Operating Agreement as drafted by Kroger, the Chief Executive Manager has primary responsibility for managing company operations and for carrying out the decisions of the Managers. Kroger gave himself as the Chief Executive Manager the full authority to bind Lone Star in all matters, without the knowledge or consent of Dornbrook or Baron of Alyth.

26. As the Chief Executive Manager of Lone Star, Kroger via Intelligent Technology owed Lone Star the fiduciary duty to account to Lone Star and to hold as trustee Lone Star's property, profit, or benefit derived from use by a member or manager of Lone Star. Wyo. Stat. Ann. § 17-29-409(b), (g).

27. Kroger also included in the Operating Agreement a provision which authorized members of Lone Star to take $200,000 in loans each year from Lone Star.

### C. Kroger's Theft of Lone Star's Money.

28. In or about October 2019, as the sole owner of Intelligent Technology and acting as Lone Star's Chief Executive Manager, Kroger unilaterally opened a bank account in Lone Star's name with a branch of Wells Fargo bank in Marshall, Minnesota (the "Lone Star Bank Account"), close to Kroger's residence in Cottonwood, Minnesota.

29. Prior to opening Lone Star's bank account, on or around September 28, 2019, Kroger represented to Dornbrook that after Dornbrook invested in Lone Star, Kroger's first step would be to purchase tax deed software to manage Lone Star's real estate portfolio, which Kroger would purchase with the money invested by Dornbrook in Lone Star.

30. On or about October 31, 2019, Kroger again demanded that Dornbrook invest in Lone Star so that Kroger could use the money to purchase real property in Texas for Lone Star's benefit.

31. In reliance on Kroger's representations to Dornbrook regarding how safe and lucrative this investment in real estate auctions would be, on November 6, 2019 Dornbrook wire transferred $640,750 into Lone Star's bank account to fund Lone Star and the business venture proposed by Kroger. On December 19, 2019, Dornbrook wire transferred another $200,000 into Lone Star's bank account, for a total investment of $840,750.

32. Kroger invested no money in Lone Star.

33. On November 7, 2019, the day after the initial wire transfer arrived in Lone Star's bank account, Kroger transferred $15,000 to his own personal bank account.

34. From November 7, 2019 through December 31, 2019, Kroger transferred a total of $231,311.95 from Lone Star's bank account to Kroger's own personal bank account.

6

35. On January 2, 2020, Kroger transferred another $200,000 from Lone Star's bank account to Kroger's own personal bank account.

36. In the remainder of 2020, Kroger transferred an additional $66,416.39 from Lone Star's bank account to his own personal bank account or to the bank account of Intelligent Technology, Kroger's wholly owned company.

37. In total, Kroger transferred $499,606.52 from Lone Star's bank account directly to his own bank account, including $11,000 that was transferred to Intelligent Technology.

38. None of the money that Dornbrook invested in Lone Star has ever been repaid to him or Baron of Alyth, nor have Dornbrook or Baron of Alyth received any distribution of profit, dividends or any other payments from Lone Star.

**D.      Kroger's Purchase of Texas Properties and Further Embezzlement of Lone Star's Money and Assets.**

39. Upon information and belief, Kroger retained Texas Tax Sales Resource Group LLC in the Dallas-Fort Worth, Texas area ("Texas Tax Sales Resource Group") to act as his or Lone Star's agent in bidding for and acquiring real property at sheriff's auctions in Texas for properties that were up for auction due to unpaid real estate taxes.

40. On November 29, 2019, Kroger transferred $200,000 from Lone Star's bank account to Texas Tax Sales Resource Group.

41. On December 3, 2019, Texas Tax Sales Resource Group used $40,000 of Lone Star's money to buy at auction the real property commonly known as 900 W. Williams, Breckenridge, Stephens County, Texas ("the Breckenridge Property").

42. On December 3, 2019, Texas Tax Sales Resource Group also used $40,000 of Lone Star's money to buy at auction the real property commonly known as 115 Griffin St., Kilgore, Gregg County, Texas ("the Kilgore Property").

43. On December 7, 2019, Texas Tax Sales Resource Group returned $133,797.00 in unused funds to Lone Star.

44. On December 30, 2019, Kroger wire transferred another $300,000 from Lone Star's bank account to Texas Tax Sales Resource Group.

45. On January 7, 2020, Texas Tax Sales Resource Group then used $106,500 of Lone Star's funds to buy at auction the real property commonly known as 310 Colonel Dr., Garland, Dallas County, Texas ("the Garland Property").

46. Although each of the Breckenridge Property, the Kilgore Property and the Garland Property were initially deeded to Texas Tax Sales Resource Group by the respective county sheriff's, Texas Tax Sales Resource Group finally deeded all three properties over to Lone Star in May 2020 and July 2020.

47. On April 14, 2020, Texas Tax Sales Resource Group refunded $169,735.62 of Lone Star's money that had not been used to buy properties at auction. However, at Kroger's instruction, that money was not returned to Lone Star's bank account and was instead wired directly to Intelligent Technology for Kroger's use and benefit. Kroger never returned or transferred that money back to Lone Star or Dornbrook. That same day, Kroger transferred $50,000 from Intelligent Technology's bank account to Kroger's own personal bank account. From April 14, 2020 to July 31, 2020, Kroger transferred $171,000 from Intelligent Technology's bank account to his own personal bank account, despite the fact that Intelligent Technology had no business or other source of income other than money stolen from Lone Star.

48. On or about January 8, 2021 Kroger unilaterally transferred the Breckenridge, Kilgore and Garland Properties away from Lone Star by signing and recording deeds transferring those three properties from Lone Star's ownership to Intelligent Technology and then immediately again transferring all three properties from Intelligent Technology to Kroger Dynasty Holdings, Inc., yet another entity wholly owned by Kroger ("Kroger Dynasty Holdings").

49. In August 2021, after being sued by Dornbrook and Baron of Alyth in Texas state court, Kroger unilaterally reversed the transfers of the Kilgore Property and the Garland Property by transferring them from Kroger Dynasty Holdings back to Intelligent Technology and then from Intelligent Technology to Lone Star.

50. In the meantime, however, in May 2021 Kroger sold the Breckenridge Property for the net amount of $23,978.15, which proceeds were directly transferred by the buyer's attorney to Intelligent Technology's bank account for Kroger's benefit. Kroger never returned or transferred that money back to Lone Star or Dornbrook.

51. In November and December 2019, Dornbrook invested $840,750 in Lone Star. By February 3, 2020, as a result of Kroger's actions, Lone Star's bank account balance was a little over $3,000, without title to any of the three Texas properties that were bought with its money and no other assets.

52. In total, Kroger directly transferred a total of $499,606.52 from Lone Star's bank account to his own bank account or to the account of Intelligent Technology for his own use and benefit. Kroger also misdirected the $169,735.62 refund from Texas Tax Sales Resource Group and the $23,978.15 proceeds from the sale of the Breckenridge Property away from Lone Star and to Intelligent Technology for his own use and benefit. Kroger further transferred thousands of

dollars from Lone Star's bank account to pay for Kroger's own personal Internet purchases, such as through Amazon.

53. None of Kroger's withdrawals from Lone Star's bank account, his transfer of the Breckenridge Property away from Lone Star, or his use of Lone Star's money for his own personal expenses were authorized or agreed to in any way by Dornbrook, Baron of Alyth or Lone Star's Operating Agreement.

54. At all times, Kroger was acting in a fiduciary capacity with respect to each of Dornbrook, Baron of Alyth and Lone Star.

55. Kroger's fraudulent intent is clear from the totality of the circumstances, including but not limited to the fact that (i) Kroger started taking money from Lone Star's bank account on November 7, 2019, the day after Dornbrook first deposited $640,750; (ii) by the end of 2019, Kroger had taken over $231,000 of the money that Dornbrook invested in Lone Star; (iii) the first business day of 2020 Kroger took another $200,000 of the money that Dornbrook invested in Lone Star; and (iv) Kroger provided no compensation or consideration to Lone Star for Kroger's taking of the $169,735.62 refund to Lone Star or Kroger's taking, selling and pocketing the $23,978.15 in proceeds from the sale of the Stephens County Property.

## COUNT I – ACTION TO BAR DISCHARGE
## PURSUANT TO 11 U.S.C. §523(a)(4) - EMBEZZLEMENT

56. Plaintiffs repeat and re-allege the allegations in Paragraphs 1–55 of this Adversary Complaint as if fully set forth herein.

57. From December 2019 to December 2020, Kroger took exclusive control and possession, for his own personal purposes, $499,606.52 that he directly transferred from Lone Star's bank account to his own personal bank account or that of Intelligent Technology, without

any direct or indirect authorization or consent from or benefit to Dornbrook, Baron of Alyth or Lone Star.

58. From April 14, 2020 through July 31, 2020, Kroger took exclusive control and possession, for his own personal purposes, $169,735.62 that belonged to Lone Star, without any direct or indirect authorization or consent from Dornbrook, Baron of Alyth or Lone Star.

59. In January 2021, without any direct or indirect authorization or consent from Dornbrook, Baron of Alyth or Lone Star, and without any payment, compensation or consideration of any kind being provided to Lone Star, Kroger transferred the Stephens County Property from Lone Star to Intelligent Technology, and from Intelligent Technology to Kroger Dynasty Holdings. In May 2021, Kroger Dynasty Holdings sold the Stephens County Property, and net proceeds of $23,978.15 were paid to Intelligent Technology for Kroger's personal use and benefit, effectively depriving Lone Star of the value of the Stephens County Property, which had been bought by Lone Star with the money invested by Dornbrook.

60. Lone Star's money and property were entrusted to Kroger by Dornbrook, Baron of Alyth and Lone Star, and he intentionally and without notice, consent or approval, misappropriated that money and property for uses other than for which they had been entrusted under circumstances that clearly establish his fraudulent intent.

WHEREFORE, the Plaintiffs respectfully request that the Court:

A. Determine that the amount of no less than $693,320.29 owed to Dornbrook, Baryon of Alyth and Lone Star is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4);

B. Enter judgment against the Debtor in the amount of $693,320.29, plus applicable interest in accordance with 28 U.S.C. § 1961; and

C. Grant Plaintiffs such other and further relief as this case may require and the Court deems just and proper.

## COUNT II – ACTION TO BAR DISCHARGE
## PURSUANT TO 11 U.S.C. §523(a)(2)(a) - FRAUD

61. Plaintiff Dornbrook repeats and re-alleges the allegations in Paragraphs 1 – 60 of this Adversary Complaint as if fully set forth herein.

62. In 2019, Kroger made multiple material misrepresentations of fact to Dornbrook that Kroger, personally and on behalf of Intelligent Technology, would properly use all of Dornbrook's investments into Lone Star for business purposes and for the benefit of Lone Star and its members.

63. In 2019, while acting as Dornbrook's attorney, Kroger represented to Dornbrook that an investment in Lone Star would be low risk and offer an opportunity for returns as high as 300%.

64. Kroger's representations to Dornbrook were false at the time that he made them, and Kroger did not have the present intent, at the time Kroger made such material representations to Dornbrook, to perform on his representations that he would properly use Dornbrook's investment for business purposes and for the benefit of Lone Star and its members.

65. The falsity of Kroger's representations is evidenced by, among other things, the fact that Kroger immediately began withdrawing large amounts of money from Lone Star as soon as Dornbrook paid the money in, leaving Lone Star's bank account nearly empty after less than two months, with no other assets to its name.

66. Kroger made such representations knowing at the time that they were false.

67. Kroger intended to induce Dornbrook to act upon his representation to agree to enter into a joint business venture with Kroger, form Lone Star, and transfer approximately $840,750 into Lone Star's bank account to fully fund Lone Star.

68. Dornbrook actually and justifiably relied upon Kroger's representation and formed Lone Star and transferred approximately $840,750 into Lone Star's bank account.

69. As a direct and proximate result of Kroger's material misrepresentations, Dornbrook suffered damages as Kroger used Dornbrook's money almost entirely for Kroger's personal benefit.

WHEREFORE, Plaintiff Dornbrook respectfully requests that the Court:

A. Determine that the amount of no less than $840,750 owed to Dornbrook is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(a);

B. Enter judgment against the Debtor in the amount of $840,750, plus applicable interest in accordance with 28 U.S.C. § 1961; and

C. Grant Plaintiff Dornbrook such other and further relief as this case may require and the Court deems just and proper.

| Dated: September 6, 2022 | /e/ Ryan Murphy |
|---|---|
| | Ryan Murphy (#311972) **FREDRIKSON & BYRON, P.A.** 200 South Sixth Street, Suite 4000 Minneapolis, MN 55402-1425 612.492.7000 rmurphy@fredlaw.com<br><br>and<br><br>John Stanis (#6198850 (IL)) (Pro Hac Vice Admission Granted) David J. Stein (#6307086 (IL)) (Pro Hac Vice Admission Granted) |

|  | **MASUDA, FUNAI, EIFERT & MITCHELL, LTD.** <br> 200 North Martingale Road, Suite 800 <br> Schaumburg, IL 60173-2033 <br> jstanis@masudafunai.com <br> dstein@masudafunai.com <br><br> **ATTORNEYSS FOR PLAINTIFFS NATHAN DORNBROOK, BARON OF ALYTH, INC. and LONE STAR MUNICIPAL FINANCE COMPANY LLC** |